Good morning. May it please the Court. My name is Jeanette Barzilay with Foley & Lardner, and I represent the appellant defendant, Yippee Entertainment. I would like to reserve a minute and a half for my rebuttal. All right. I'll watch the clock. Yippee is a producer of faith-based video content for children and families, and it provides access to that content through exclusively a paid subscription model. The threshold issue on this appeal, and the only issue that the District Court decided below, is whether Yippee's subscription sign-up page provided sufficient constructive notice to the plaintiff of the terms and the arbitration agreement in them. And the answer is yes, and I'll spend the majority of my time explaining why. But first, I'd like to walk through the Yippee subscription sign-up process that the plaintiff, Ms. Morrison, experienced when she purchased her subscription. Every person who wants to view Yippee content must take a number of affirmative steps to sign up for their paid subscription. They must either have or create a Yippee account. They must provide their name, email, and payment information. They must then click on a Start Subscription Action button that confirms their intent to purchase that subscription. And they must agree that by so clicking, they've agreed to our terms of service that will govern their subscription purchase. Can I ask you for clarification on something? I just want to make sure that my understanding of the record is correct. Since the lawsuit, the subscription notice has been revised, right? So if I go on it now, that's not what the plaintiff saw. I'm actually not certain that's true. I believe it's the same, but we're only looking at what was at issue in September of 2023. So at that time, the terms were then made available to the consumer through a conspicuous blue link, which would display a pointer finger when the user placed the cursor over top. And if they clicked that link, they would be directed to a separate Yippee webpage with the full text of the terms, advising two things clear right up front. First, that they are, in fact, the terms that will govern the user's use of the service through which they'll view the video content. And second, that those terms contain a mandatory arbitration agreement with those terms in bold and capital letters. The plaintiff, Ms. Morrison, in this case, like all other Yippee subscribers at that time, took each of these steps when she signed up in September of 2023. Now the question again for this court is whether those steps and the design of the page provided sufficient notice to Ms. Morrison of those terms. And under this court's precedence, Yippee did provide sufficient notice. That well-worn test for constructive notice is whether, first, the webpage provides reasonably conspicuous notice of the terms, meaning it's displayed in a font size and format that allows the court to assume a reasonably prudent user would see it, and two, that that user takes some action, such as clicking a button, that will unambiguously manifest consent to the terms. Some of our case laws talked about when you have multiple links close together that that can create confusion. It seems like that's going on in this website. So how do you deal with that problem? Yes, Your Honor. I believe in this case, again, we're looking at the totality of the circumstances. There were a series of links presented in the disclosure paragraph above the button, but they were separated by a black comma, and the titles make clear that they're separate things. So we have the terms of service comma, a privacy policy comma, a cookies policy, and if the user then clicked each of those, they would be a separate link to a separate page. So we believe in the context of the design of this page, the presence of other links was not confusing about what terms applied to the transaction. As a third sort of ancillary part of the test, courts look at the transaction's context as well and are more likely to enforce a set of linked terms if the context contemplates some type of ongoing relationship like the subscription purchase here. Now, as this court recently confirmed in the GoDoon v. JustAnswer case, there's no checklist or bright line test. We're looking at a totality of the circumstances, and even minor differences can make the difference. And we believe they do tip the scales in Gibby's favor on element one, and that's where the district court erred. First, the link to the terms was set off in bright blue text against a white background, which is the traditional way of designating a hyperlink. Second, if the user clicked those bright blue terms link, they'd be transferred to a separate page containing the full set of terms with Gibby's logo at the top and advising in bold capital letters that it contained an arbitration agreement. Third, we believe the link was prominently displayed in a disclosure paragraph just above the action button. Counsel, if we agree with you on the reasonably conspicuous prong, do we send it back to the district court for determination of mutual assent, or do we assess that secondary step in the first instance? Thank you, Your Honor. All the court has to do is address element one because that is the only issue that the district court decided below. We believe it's appropriate for this court to exercise its discretion and address element two, mutual assent, because that issue was fully briefed and presented to the court below, and it's an issue of law whether that consent was unambiguous or not. So we believe the court can decide element two in this case, and we think it should in our favor, but the court does not need to reach that issue because the district court did not decide it. Turning back to the analysis, the third element here, the link was prominently displayed, again, in a disclosure paragraph beneath the payment information and above that action button, which breaks up the user's natural flow and makes sure the user would see it. And then the text of the button as well, start subscription, was very clear what action the user was going to take that would constitute a transaction and to which those terms would apply. Fourth, the text was not extremely small or barely legible, like in some of the other cases, like in Berman. And finally, the text is not cluttered or obscured by other features. Early on, my colleague asked if it had changed, and he said you didn't think it changed, but I think it did change. And I think just anticipating what I think you're going to have to answer this afterwards if you don't answer it now, but you now have a little click box that you have to check, and I assume your colleagues on the other side are going to say, well, you changed it because that's sort of an admission that it was deficient before. What is your response to that? First, I apologize if I'm not fully up to speed on those changes. Again, for this purpose, we're looking at what was at issue for Ms. Morrison. Having not seen it, I can't opine. I don't believe that it's – Well, now I have a little – you know how you've been a – Yeah, I understand what it looks like, yes. And you didn't have that before. I don't believe it – It looks pretty similar, otherwise. Yeah, I don't believe that makes a material difference. That would make it more like a click box as opposed to the sign-in wrap agreement. I still believe in this case that the text advised that by clicking below, she was going to agree. That button was right there, and the user's flow would lead her to that button. So I still believe it satisfies the Berman test. Element two, Berman says – Well, it would make a difference on the mutual assent, unambiguous manifestation of assent analysis. It might make it stronger, Your Honor. I don't disagree with that point, but I think we've already satisfied that, even under the sign-in wrap agreement and the Berman test, because the language advises that the user, when clicking below, is going to agree to that set of terms, and the button's right there beneath. So in the context of the transaction, I believe it's sufficiently clear, and we've already satisfied element two. So I don't believe it changes it or it's dispositive in terms of the outcome of the case. I think our case law here is a bit of a mess in terms of it seems like if I look at a website and think I would be confused, I can say that it's not good enough, and if I look at it and think I wouldn't be confused, then I can say it's fine. There's a lot of squishiness here. What's your best case? We believe, Your Honor, actually the Oberstein case, Ninth Circuit case, is favorable. That court analyzed two separate pages, both a sign-up page and a payment page, and I believe the design of those pages is substantially similar to the design of Yippee. Oberstein had three levels, right? Am I missing – I've read so many of these cases, they're starting to blend. But if I'm remembering right, Oberstein had three different spots where you took action or you had information to receive. Am I right about that? It did have, like, a sign-up page and a payment page. Right. But as I recall, the court analyzed them separately and found that both of them were sufficient on their own. Chaboya, I know, had three different pages that the party in that case was trying to sort of cobble together to create constructive notice, and the court found that that was not sufficient. But I believe the design in Oberstein, either the sign-up page or the payment page, is similar, where there were kind of graphics on the left-hand side, but then the user reading left to right is directed to the right, where following that flow from top to bottom, they are filling in their registration information, then beneath the payment, and then the disclosure is right there beneath. So the eye is following down towards that button, and then they have to decide in the end, do I want to make this purchase, and they have the opportunity to click the links to the terms above that are going to apply to that or not. I know you wanted to save a little bit of time. I still have a minute. Oh, no, I have a minute overall. All right. I believe, actually, that we've covered all the issues, so I will yield my time and yield to Mr. Roberts. Thank you. Good morning, Your Honors. My name is Max Roberts, bursar in Fisher for Plaintiff Appellee, Brittany Morrison, and I'm joined by my colleague, Victoria Zhao, also a bursar in Fisher. So the first thing I want to address, as Judge Van Dyke pointed out, is, yes, the terms have changed on YIPI's website, but it's not just that there's a checkbox. They've taken the advisal that is specific to the Vimeo terms. They put it in a separate paragraph from the automatic renewal terms. They put that advisal right above the button that the user has to click on, and they've removed the Google terms. And I could certainly nitpick. I could say, oh, the space between the advisal and the automatic. I guess the question is what to do with something like that because, you know, if I get sued for something and I think that what I'm doing is just fine, but my lawyers are going to tell me, you know, court might disagree with you, especially, as my colleague said, this is kind of a seems like this is a very odd area of the law where you just might get smacked if you're a company. So why wouldn't you make these changes? But I don't know that, you know, are we supposed to draw from that? Like is that admission that they were wrong? No, Your Honor. That's impermissible under 407. So let me ask you a question about your – how is your monitor set up? Is your monitor set up this way or is your monitor set up this way in the office? Actually, both, Your Honor. So do I. So do I. So if you look at it, if you look at the – if you look at their page, and you gave us the page and it looked like this, but the problem is I don't think most people see the page like that, right? When they – you know, when I look at it on my regular monitor, which is what do they call it, landscape? Is that what they call it, landscape? Yes. The page is cut in half. And so how does that affect – I didn't really see that actually addressed by either side, but how does that affect like the argument that it's cluttered? Because a lot of this stuff that you're saying that you guys emphasize and the district court emphasizes being cluttered is actually above the fold, so to speak, when you – you don't even see it when you're looking at it in that traditional way. Your Honor, I would still say that the terms hyperlink is inconspicuous because there's still the multiple hyperlinks. There's the Vimeo terms and there's the Google terms. The user's eyes are going to be drawn to the blue button, the start subscription button, and it's still buried in the – So you're relying heavily on the fact that there's multiple hyperlinks, which I think is true. What about the – there are several aspects, though, that the district court relied on. One is the fact the clutteredness aspect seems to me to be affected by the fact that it – you understand what I'm saying, that it takes two pages. The other thing that seems to be affected by that is it does look really tiny when you look at it the way you guys presented it, but obviously if you break it up and expand it to the side, then it doesn't appear near as tiny. So what do we do with that? I can't find cases that tell me what to do with that. Your Honor, the only evidence that I can point to is the way that it was presented in the record, although I understand your point is a practical matter. Nobody's looking at it this way, right? They're looking at it on a – I mean, as I recall, your client actually said that she – I think it was she looked at it on a computer screen, right? Yes. They didn't look at it on here. She looked at it on a screen. So it's still – the other point that I was going to make, Your Honor, is that it's still in a paragraph that largely deals with other terms, and we've cited cases like the Seneca case, which I understand is unpublished, but it's a Ninth Circuit case. There's the Tejon case from the Southern District of Florida, and both of those discuss how when you have – and the Herzog case from the California Supreme Court. And all of those discuss that when you have other terms on the page, it leads the user to the impression that those are the only terms that there are. So even if a user read every little line of this paragraph, they're still going to be under the impression that, oh, this is just dealing with automatic renewal. It's not dealing with some other company's terms. Yeah, so when I read all – when I read these cases, which just left me with feeling sorry for companies, right? I got the impression that the Ninth Circuit – a lot of the cases, first of all, are Ninth Circuit, which is kind of odd. A lot of – we have opinions on this, and it's really California law, supposedly. But when I read all of it, I kind of came with the impression if I was advising a company, that I'd be like, I don't know how you can get away from – how you can be absolutely sure you wouldn't be found liable by some court unless you created – and I forget the term, but the one where the box pops up and you click on it that we all find super annoying when we have to – that extra step that we have to go through when we – but is that sort of – is that the takeaway here, that we can only – the only way you can escape liability under these tests is if you just don't even have this type – is this a – what is this? This is a sign-up wrap, Your Honor. Okay, yeah. So let me make two points on that, Your Honor, if I may. The first – and this is what I was getting at with YIPI's changes – is that it's very trivial to fix a sign-up wrap screen. I think what YIPI is currently doing is fine, and that took probably an hour of somebody's time. And the real inquiry under all of these cases, it's not this rigid checklist. It's have you set the terms that you are trying to bind users apart? What is it about their current page? Is it the fact they have to check that little box, or is it not that? It's the fact – what is it about their current page? That it makes you think that it's okay, whereas the old one wasn't. It's the fact that they have taken the advisal pertaining to the Vimeo terms, they've separated it out, and they put it directly above the button, so it's not involved in this paragraph. That just seems – your average customer – and we're all buying stuff all the time. We're racing through. We're wishing that people just had the buy it now option like Amazon has, right? And so the idea that real customers are – this all just feels kind of made up. I mean, let's speak practically for a second, Your Honor, right? Nobody reads these terms and conditions. So why is there a test that says, oh, if you put three hyperlinks beside each other, blow people's mind, they won't be able to like – There has to be some way for companies to contract with consumers over the internet. But the test the Ninth Circuit has said is you can do that. Just give them notice, and that's really not that hard to do. And what the Seventh Circuit said in the Seguros v. TransUnion case is that's really easy to accomplish as the enormous – That's what I'm thinking. It's like 99% of the people are never going to try to find these terms. Even if they know, they're not going to – That 1% of people – here's the thing. But you do want them to be able to get to them if they do want to click through, right? And that's what I'm struggling with. If they wanted to find the terms here under the old agreement, not the new one, the old – is it that hard? I mean, yes, there's three hyperlinks instead of one, but one says, let's say, terms of use or something, right? So the other point I was going to make, Your Honor, is even if the court assumes that there's notice and assent here, which is a whole separate question, these are not YIPI's terms. These are a whole separate company's terms. And as we made clear in our briefing – I think the problem that I have with your argument and the fix that's currently displayed on the webpage is that the fix seems to go more towards the manifestation of assent element than it does to the conspicuousness argument because, you know, we're talking about how cluttered this is. There's a lot there. And I think you said earlier in your response to Judge Van Dyke's question that, well, when you click start subscription, you may think that you're signing up for automatic renewal instead of the link to the terms and conditions, et cetera. But even the fix has it all in the same paragraph. Now, it changes in that it's more explicit. Instead of saying by clicking below, it now says by clicking start subscription. So that better meets the case law requirement for explicit advisement of what action you have to do to assent. But, again, that goes to the second element, which the district court didn't address. So how do you – doesn't that undercut your argument that it's all cluttered and they've somehow fixed it? It's all still there in the same paragraph. So either you don't read it, which most of us don't, or if you read it, it's still all there. Your Honor, the advisal is in a separate paragraph, although I agree with you that the other fix that they made is that instead of by clicking below, which is very ambiguous, it's now by clicking start subscription. But, again, I think even if the court doesn't want to wade into these issues of notice and assent, the easiest way to resolve this appeal is that these aren't their terms. There's a specific contract or specific provision of the Vimeo terms that say if they have an agreement with Vimeo to arbitrate disputes against consumers, then they can enforce the arbitration agreement here. So you're saying reach the issue that the district court didn't quite get to? You certainly could, Your Honor, as my friend on the other side pointed out. The court is empowered to, although I also understand that the general preference is to remand it for further consideration. But the third-party beneficiary issue is that there is a specific provision that says if you have a separate agreement with Vimeo, then you can enforce the arbitration clause. There is no evidence of that agreement here, notwithstanding there's no notice or consideration of it. Equitable estoppel, there's none of that here either. These are separate obligations imposed by statute, and as the forward warranty cases set out that we just submitted in our 28-J later of July 2020, that is not the situation that equitable estoppel exists in. We're not trying to enforce a contract. These are separate statutory obligations. So regardless of the notice, regardless of the assent, this court can say, okay, I am just assuming that Yippie's right, but you still can't enforce these terms. And I think that's the easiest way to resolve this appeal without further moneying the case law if, Judge Van Dyke, your concern is you want to give... You don't want to tell businesses conflicting messages and you want to sort of make something very clean for them. And I see my time is up. Unless you have further questions, I'll rest. All right. Thank you, Counsel. Thank you. Thank you, Your Honors. I'll be as brief as I can. On the last point, the issue of, you know, they aren't our terms. Respectfully, we disagree. We've adopted them. Yippie adopted them as its own, linked to them as our terms. It's on a Yippie webpage. But that, again, is not an issue of constructive notice. That's not the threshold issue on this appeal. Whether Yippie can enforce those terms as a third-party beneficiary, given there's ample language in the terms benefiting third-party beneficiary producers like Yippie, is a threshold arbitrability question that is reserved for the arbitrator in this case. On the few points about sufficiency, I agree with Justice Van Dyke, your comments about the cluttered aspect. The user has to flow down the page past the disclosure to hit the Start Subscription button. So whatever emoticons or graphics are elsewhere, we don't believe clutters the page. I would point the court to Driscoll and Dorman as other cases that had links in a series where the courts found sufficient notice. Thank you. All right. Thank you. Thank you very much, counsel, for both sides for your argument. The matter is submitted.
judges: NGUYEN, FORREST, VANDYKE